IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES COMMODITY<br>FUTURES TRADING COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>SENEN POUSA, INVESTMENT<br>INTELLIGENCE CORPORATION,<br>*DBA* PROPHETMAX MANAGED FX,<br>JOEL FRIANT, MICHAEL DILLARD, and<br>ELEVATION GROUP, INC.,<br><br>*Defendants.* | §§§§§§§§§§§§§§ | Civil Action No. A-12-CV-0862-LY |

# FIRST INTERIM STATUS REPORT OF
# THE RECEIVER OF THE PROPHETMAX RECEIVERSHIP ESTATE

TABLE OF CONTENTS

PAGE

I. Introduction ................................................................................................................. 1

II. The Receiver's Administration of the Estate ............................................................ 2

    A.    The Receiver's Communications with Investor Victims ..................................... 2

    B.    The Receiver's Investigation of Domestic Matters .............................................. 3

    C.    The Receiver's Marshaling of Domestic Assets ................................................... 4

    D.    International Matters .............................................................................................. 5

        i.    The Receiver's Investigation and Cooperation with Foreign Authorities ................................................................................................. 5

        ii.    The Receiver's Marshaling of Foreign Assets ............................................... 7

    E.    The Receiver's Identification of Investor Victims ............................................... 7

        i.    The Receiver's Estimation of Assets and Timing for a Distribution ............. 9

        ii.    The Receiver's Estimation of Timing to Wind Up the Estate ...................... 10

CERTIFICATE OF SERVICE ........................................................................................ 11

## I. INTRODUCTION

1. On September 18, 2012, the Court entered a Statutory Restraining Order ("Order") [Docket #4] appointing Guy M. Hohmann to serve as the Receiver for the assets of Defendants Senen Pousa, Investment Intelligence Corporation, *dba* ProphetMax Managed FX ("ProphetMax"), and Joel Friant ("Friant"), including the assets of their respective affiliates or subsidiaries (collectively, the "ProphetMax Receivership Estate" or "Estate"). *See* Order ¶¶ 11, 19. Under the Court's Order, the Receiver was given broad duties and powers to manage the Estate.[1]

2. The Receiver files this First Interim Status Report of the Receiver of the ProphetMax Receivership Estate ("Status Report") under paragraph 24 of the Order, which directs the Receiver to file a report with this Court "outlining the steps taken to identify customers, marshal assets, determine the amount invested by each customer, and the portion of assets available to pay back customers." Additionally, the Order directs the Receiver to include a statement in the Status Report concerning "the estimated time it will take to distribute available assets to customers and wind up the [Estate]." *See id.*

3. This Status Report will also be posted on the Receiver's website for the Estate at www.prophetmaxreceivership.com.

---

[1] The Receiver was given the following duties and powers: (i) assume full control of ProphetMax and its business entities; (ii) take exclusive custody, control, and possession of all funds, property, mail and other assets of Defendants; (iii) assume full power to sue for, collect, receive and take possession of Defendants' goods, chattels, rights, moneys, land, books, and records; (iv) take all steps necessary to secure Defendants' residential and business premises; (v) preserve, hold and manage all assets of the Estate, and perform all acts necessary to preserve the value of those assets, in order to prevent any loss, damage or injury to Defendants' customers or clients; (vi) prevent the withdrawal or misapplication of funds entrusted to Defendants; (vii) manage and administer Defendants' assets; (viii) collect all money owed to Defendants; (ix) initiate, defend, compromise, or become a party to any actions or proceedings necessary to preserve or increase Defendants' assets; (x) engage and employ attorneys, accountants, appraisers, and other technical specialists, as the Receiver deems advisable or necessary; (xi) issue subpoenas and conduct discovery to obtain documents and records pertaining to the Estate; (xii) open bank accounts as designated depositories for Defendants' funds; and (xiii) make payments and disbursements from the Estate that are necessary or advisable. *See Order* ¶¶ 19-20.

## II. THE RECEIVER'S ADMINISTRATION OF THE ESTATE

4. The Receiver's initial administration of the Estate has demanded a substantial amount of time and attention from the Receiver and his legal counsel (the "Receiver Team").[2] These demands have been driven primarily by the Receiver's broad duties and powers to manage the Estate, and the many legal and financial issues that must be resolved during the infancy of a complex, international receivership like this one. The Receiver Team's efforts have also been complicated by the international nature of the alleged fraud, which has required the Receiver Team to collaborate with domestic and foreign authorities to further the Receiver's investigation and locate potential assets of the Estate. Thus far, the Receiver Team's efforts have focused primarily on recovering and maximizing the value of domestic assets while working with government authorities to identify and recover foreign assets of the Estate.

### A. The Receiver's Communications with Investor Victims

5. Following the Receiver's appointment by the Court, and particularly during the early days of the Estate, the Receiver Team received and responded to a substantial number of inquiries and requests for information from investors. Additionally, the Receiver Team has received valuable information from investors that has furthered the Receiver's investigation and helped the Receiver Team identify investor victims who may be eligible for future distributions from the Estate. To streamline these communications, the Receiver Team created: (i) a public email account for the Receiver, receiver@prophetmaxreceivership.com; (ii) a Facebook page for the Estate entitled "ProphetMax Receivership"; and (iii) an Internet website for the Estate, www.prophetmaxreceivership.com. The website provides general information concerning this action, the Receiver, the Estate, and the alleged fraud, including answers to frequently asked

---

[2] For a description of the various tasks and issues addressed by the Receiver Team during the initial days of the Estate, please see the Receiver's Unopposed Motion for Approval of First Interim Fee Application and Brief in Support [Docket #30], which details the efforts of the Receiver Team from September 18, 2012 to September 30, 2012.

questions from investors. The website also provides links to relevant court filings in this action. The Receiver Team continues to update the Estate's website and Facebook page to provide additional information concerning this action, the Estate, and related proceedings.

6. The Receiver Team has also provided timely and important information to the United States Commodity Futures Trading Commission ("CFTC") and the Securities and Exchange Commission ("SEC"), which has a separate but related action currently pending in this Court, Civil Action No. 1:12-cv-863-LY, *Securities and Exchange Commission v. Senen Pousa and Investment Intelligence Corporation Pty LLC*. As part of this process, the Receiver Team has collaborated with the CFTC, SEC and foreign authorities to coordinate ongoing investigations around the world and identify potential assets of the Estate.

B. **The Receiver's Investigation of Domestic Matters**

7. Following the Receiver's appointment, the Receiver Team reviewed court papers filed by the CFTC in this action and those filed by the SEC in its separate action. The Receiver Team has also participated in multiple meetings with representatives of the CFTC and SEC, as well as a representative of the Australian Securities and Investments Commission. As part of this process, and to begin identifying and locating assets and records of the Estate, the Receiver Team reviewed a substantial number of documents concerning the alleged fraud and Defendants' purported business activities. This process included negotiations and interviews with the former United States attorneys of a foreign Defendant, which allowed the Receiver Team to obtain and review the foreign Defendant's domestic files, records, and related documents.

8. The Receiver Team also drafted and filed notices of the Court's Order and the CFTC's Complaint in other federal district courts under 28 U.S.C. § 754, which vests the Receiver with complete jurisdiction and control of all property of the Estate located in those districts. The Receiver Team also drafted and sent notices concerning the Receiver and the

Estate to financial entities and other third parties that may hold assets or records of the Estate. The Receiver Team then negotiated with many of these third parties to secure custody and control over those assets and records. The Receiver Team continues to send additional notices to new third parties when they are identified during the ongoing investigations, and to negotiate with these third parties to recover the Estate's assets and records.

9. The Receiver Team continues to collaborate with the CFTC, SEC and foreign authorities as their investigations proceed, as these efforts help the Receiver conduct his own investigation and recover assets as efficiently as possible. Additionally, the Receiver Team continues to review new documents as they become available during the investigation.

C. **The Receiver's Marshaling of Domestic Assets**

10. During these first few months of the Estate, the Receiver Team has largely focused its domestic efforts on identifying, securing and maximizing the Estate's assets. This process has included negotiations with a domestic Defendant's counsel to secure and preserve certain real and personal property in the United States, and to secure and image the Defendant's electronic devices. The Receiver Team also successfully negotiated terms for the return of $750,000 in funds that were received by Defendant Elevation Group, Inc. ("Elevation Group") as commissions for membership fees paid to ProphetMax by certain of Elevation Group's clients.

11. As of December 20, 2012, the Estate has $409,924 deposited in a bank account under the Receiver's sole control (the "Estate Account").[3] The Receiver has also secured an additional $2,856 in liquid assets (e.g., cash or marketable securities) that have been frozen in

---

[3] To date, the Estate Account has received $500,000 in deposits and $211 in earned interest. The deposits reflect Defendant Elevation Group's installment payments to the Receiver to return commissions received from ProphetMax. The Receiver expects the Estate Account to receive an additional $250,000 in deposits from Elevation Group over the next two months. The Estate Account has incurred wire-transfer fees totaling $30, and as approved by the Court, the Receiver has withdrawn $90,256 from the Estate Account to pay services rendered to the Estate and related expenses incurred from September 18, 2012 through September 30, 2012. *See* Order Granting Receiver's Unopposed Motion for Approval of First Interim Fee Application [Docket # 40].

other accounts under the Court's Order. *See* Table of Liquid Assets, attached as Exhibit A to this Status Report. The Receiver has also secured an automobile, residential property, and rental property (collectively, "Other Assets") with an estimated total market value of $591,972. *See* Table of Other Assets, attached as Exhibit B to this Status Report.

12. At the present time, the Receiver's investigation suggests that each of these Other Assets have negative net-asset values as a result of outstanding secured debt. The Receiver Team is currently trying to recover necessary records from certain financial institutions so that the Receiver can determine whether it's in the best interests of the Estate to abandon the Other Assets, subject to Court approval.

13. Finally, the Receiver also has custody and control of certain intangible assets relating to legal claims that formerly belonged to certain Defendants. In particular, the Receiver Team is currently negotiating the potential resolution of claims against a third party who received $750,000 in funds relating to the alleged fraud. At the present time, the Receiver believes that nearly all of these funds will be returned to the Estate within the next 60 days. If the funds are not returned within this timeframe, then the Receiver intends to pursue litigation against the third party to recover these funds.

**D.  International Matters**

14. Due to the international nature of the alleged fraud and Defendants' limited domestic assets, the Receiver Team has devoted substantial time and effort to provide information to foreign authorities so they might be in a position to secure funds or other assets that were procured through apparent acts of fraud.

  **i.  The Receiver's Investigation and Cooperation with Foreign Authorities**

15. The Receiver Team has communicated with several foreign regulators and other authorities to further ongoing investigations, potentially seize foreign assets of the Estate, and

provide information concerning the Receiver and this Estate. Unfortunately, the Receiver cannot provide non-public information concerning any foreign investigation, but two foreign authorities have issued press releases concerning their investigations and seizure of assets.

16. In July 2012, the Australian Securities and Investments Commission ("ASIC") announced that it was investigating the alleged ProphetMax fraud along with authorities in the United States, New Zealand and the Netherlands. *See* ASIC Press Release, "ASIC Freezes Suspect Funds Held by Unlicensed Financial Mentoring Company" (July 27, 2012), attached as Exhibit C to this Status Report.[4] According to ASIC's investigation, ProphetMax members were advised to trade foreign currency through IB Capital, a New Zealand-registered company, and instructed to transfer their money to IB Capital's account with ING Bank in the Netherlands. *See* Ex. C (ASIC Press Release). As a result of its investigation, ASIC has secured over $3.4 million in ProphetMax accounts. *See id.*

17. In December 2012, the Dutch Fiscal Intelligence and Investigation Service ("FIOD") announced that it had arrested two main suspects in a criminal money-laundering investigation concerning an international, foreign-currency investment fraud. *See* FIOD Press Release, "Investigation into International Money Laundering Case" (December 17, 2012), attached as Exhibit D to this Status Report.[5] Other news reports from the Netherlands suggest that one of the arrested suspects is a director of IB Capital. According to FIOD's investigation, IB Capital had been used as an intermediary to transfer "many millions of euros" of investor funds to the suspects' bank accounts. *See* Ex. D. (FIOD Press Release). As a result of its

---

[4] Also available at 12-175MR, *ASIC Freezes Suspect Funds Held by Unlicensed Financial Mentoring Company* (2012), http://www.asic.gov.au/asic/asic.nsf/byheadline/12-175MR+ASIC+freezes+suspect+funds+held+by+unlicensed+financial+ mentoring+ company?openDocument.

[5] Also available at Functioneel Parket, *Investigation Into International Money Laundering Case* (2012), at http://www.om.nl/actueel/nieuws-persberichten/@159998/investigation-into/.

investigation, FIOD and other Dutch authorities have seized over €13 million, or approximately $17.2 million,[6] in frozen bank accounts. *See id.*

### ii. The Receiver's Marshaling of Foreign Assets

18. Despite the difficulties posed by the international nature of the alleged fraud and the seizure of assets and records in foreign jurisdictions, the Receiver Team has made considerable progress in locating foreign assets and records of the Estate. As noted above, foreign authorities have seized approximately $20.6 million in connection with the alleged fraud. The Receiver is cautiously optimistic that one or more foreign authorities will ultimately release a material portion of these funds to the Estate for distribution to investor victims. To assist the Receiver's efforts to recover these funds, the Receiver Team has informed foreign authorities that the Receiver intends to recover and distribute proceeds of the alleged fraud to all investor victims, on a pro-rata basis, regardless of any investor's citizenship, residency or address, subject to this Court's approval.

### E. The Receiver's Identification of Investor Victims

19. Following his appointment by the Court, the Receiver promptly began the process of identifying investor victims who may be eligible for future distributions from the Estate. First, the Receiver Team obtained an investor spreadsheet created by Defendant Michael Dillard and his legal counsel that reflected the Elevation Group members who invested in ProphetMax. The spreadsheet, which was based upon information provided by Elevation Group members, details each investing member's investment amounts and losses in the alleged fraud.

20. Second, the Receiver Team recovered a second spreadsheet from Defendant Friant, who purportedly provided "back-office" and customer-relation services for ProphetMax,

---

[6] Based upon the Euro-U.S. Dollar Exchange Rate of 1.32239 at market close on December 20, 2012. *See* http://www.xe.com/ucc/#rates.

including correspondence with ProphetMax's investors. Friant's spreadsheet was recovered during the Receiver's investigation, which included the Receiver's review of Friant's financial records, documents, emails, and other electronic information. Friant's spreadsheet, which is believed to reflect nearly all investors affected by the alleged fraud, also includes information concerning investors' investment amounts and losses.

21.  The Receiver Team then combined these two spreadsheets into a single master list, organized by country based upon each investor's address, and deleted redundant entries as appropriate (the "Master List"). To verify and supplement information in the Master List, the Receiver Team has also contacted investors through the Estate's website and Facebook page, and communicated directly with some investors through email and telephone correspondence. Through this correspondence, the Receiver Team has added additional investors to the Master List and continued to verify existing information. Additionally, the Receiver Team has verified or added new investors to the Master List through correspondence with foreign regulators. The Receiver Team continues to update the Master List as new information becomes available.

22.  Based upon his current investigation, the Receiver believes the Master List provides a substantially complete list of investor victims who were affected by the alleged fraud. At the present time, however, the Master List is incomplete because it does not provide necessary information for all investors. When the Master List is finalized, it will provide each investor's name, address, contact information, investment amounts, investment losses, and where appropriate, conversions from foreign currencies.

23.  When the Receiver determines that sufficient assets are available for distribution, he intends to seek this Court's approval to begin a claims process. The Receiver believes this claims process will provide the Receiver Team with sufficient information to finalize the Master List and capture all investor victims who may be entitled to a future distribution from the Estate.

### i. The Receiver's Estimation of Assets and Timing for a Distribution

24. At the present time, the Receiver does not believe there are sufficient assets in the Estate to warrant a distribution. Additionally, the Receiver cannot reasonably estimate when the Estate will hold sufficient assets for a distribution, or when a distribution might occur, as there is too much uncertainty concerning the repatriation of foreign assets. As noted above, there have been significant developments concerning the seizure of foreign assets by foreign authorities, and the Receiver is cautiously optimistic that one or more foreign authorities will ultimately release a material portion of these funds to the Estate for distribution to investor victims. But the timing and amount of any recovery is unclear, as the repatriation process will be driven primarily by the direction and pace of foreign regulatory and judicial proceedings that are inherently difficult to predict.

25. Despite these uncertainties, the Receiver can provide some guidance on possible scenarios for future distributions of foreign funds. Given the criminal proceedings in the Netherlands, it is possible that the funds secured by Dutch authorities ("Dutch Funds") may be refunded to investor victims through a criminal-restitution proceeding. If this occurs, then the Dutch Funds may not be released to this Estate. Additionally, given the civil proceedings in Australia, it is possible that the funds secured by ASIC ("Australian Funds") may be distributed to investor victims by a liquidator appointed in Australia. If this occurs, then some or all of the Australian Funds may not be released to this Estate. Conversely, if Dutch or Australian authorities ultimately appoint, recognize or otherwise use the Receiver as a distribution agent for foreign funds, then it is possible that some or all foreign funds will be released to this Estate. The Receiver is cautiously optimistic that at least some of the Australian Funds will be released to this Estate.

26.   Absent any settlement in the Dutch criminal proceedings, the Receiver does not currently expect the Dutch proceedings to be resolved before 2014, and it is unclear whether Dutch authorities would distribute Dutch Funds before the criminal proceedings are final. The Receiver believes the Australian civil proceedings will likely be resolved in 2013, so it is possible that Australian authorities could determine how to distribute Australian Funds in 2013, perhaps as early as the summer. The Receiver and his legal counsel will continue to update the Court as this process unfolds.

27.   Based upon his current investigation, the Receiver believes that the assets and funds identified in this Status Report reflect the substantial majority of assets that may be recovered by the Estate. The Receiver Team is trying to recover and return funds to injured investors as quickly and efficiently as possible but the Receiver expects that uncertainties concerning the timing and recovery of foreign assets will persist in the near future. In light of these issues, and the limited amount of funds that are currently held or controlled by the Estate, the Receiver and his legal counsel are significantly adjusting staffing to reduce fees incurred by the Estate. Although the Receiver is mindful of his duties to the Estate, he will endeavor to reduce his time on this matter, and where possible, assign tasks handled by his legal counsel to non-lawyer personnel.

ii.   **The Receiver's Estimation of Timing to Wind Up the Estate**

28.   For the reasons discussed above, the Receiver cannot reasonably estimate when he might be able to wind up the Estate, as this process will be driven primarily by the direction and pace of foreign proceedings that are inherently difficult to predict. In any event, current expectations concerning the progress of foreign proceedings suggest that the Receiver may not be able to wind up the Estate before 2014. The Receiver will continue to update the Court as this process unfolds.

Respectfully submitted,

HOHMANN, TAUBE & SUMMERS, LLP

By: ___/s/ Christopher W. Ahart___
    Christopher W. Ahart
    State Bar No. 24036115
    chrisa@hts-law.com
    100 Congress Avenue, 18th Floor
    Austin, Texas 78701
    (512) 472-5997
    (512) 472-5248 (Fax)

**ATTORNEY FOR GUY M. HOHMANN, IN HIS CAPACITY AS RECEIVER FOR THE PROPHETMAX RECEIVERSHIP ESTATE**

## CERTIFICATE OF SERVICE

On December 21, 2012, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

    ___/s/ Christopher W. Ahart___
    Christopher W. Ahart

## TABLE OF LIQUID ASSETS
## PROPHETMAX RECEIVERSHIP ESTATE

| Financial Institution | Account Holder[7] | Account Number[8] | | Amount[9] |
|---|---|---|---|---|
| Scottrade | Joel Friant | xxxx9118 | $ | 480 |
| U.S. Bank | Joel Friant | xxxxxxxxx0079 | $ | 2 |
| | | xxxxxxxxx9324 | $ | 1,033 |
| | | xxxxxxxxx9952 | $ | 1,323 |
| | | xxxxxxxxx0947 | $ | 1 |
| | | xxxxxxxxx2323 | $ | 10 |
| Barclays | Joel Friant | xxxxxxxxxxxx9998 | $ | 0 |
| Industrial Credit Union | Joel Friant | xxxxx | $ | 2 |
| | | | $ | 5 |
| Citibank | Joel Friant | xxxxxxxxxxxxx316 | $ | 0[10] |
| Nationwide Visa | Joel Friant | | $ | 0 |
| HSBC | Joel Friant | | $ | 0 |
| **SUBTOTAL OF LIQUID ASSETS:** | | | $ | **2,856** |
| Regions Bank | The Receiver | xxxxxxxxx | $ | 409,924 |
| **TOTAL LIQUID ASSETS:** | | | $ | **412,780** |

## EXHIBIT A

---

[7] The Account Holder includes any affiliates or subsidiaries of the named Defendant.
[8] The Receiver has redacted digits within each account number to protect the confidentiality of this information.
[9] Amounts are rounded to the nearest dollar.
[10] This account is a credit card with a current debt balance of $19,134.

## TABLE OF OTHER ASSETS

## PROPHETMAX RECEIVERSHIP ESTATE

| Asset | Debt | Debt Value | Estimated Fair Market Value | Net Asset Value |
|---|---|---|---|---|
| BMW X5 | BMW Loan | $ 30,500 | $ 23,358 | -$ 7,142 |
| Residential Property | PNC Loan<br>Key Bank Residential Loan<br>Total: .................................. | $323,890<br>$ 45,450<br>$369,340 | $341,243 | -$28,097 |
| Rental Property | Bank of America Loan<br>Key Bank Rental Loan<br>Total: .................................. | $156,000<br>$ 89,484<br>$245,484 | $227,371 | -$18,113 |
| **TOTAL OTHER ASSETS** | | $645,324.00 | $591,972.00 | **-$53,352** |

**EXHIBIT B**



Publications A |Media Centre|A |DVIF|#uhh}hv|vxvshfw|xqgv|khq|e|xqdfhqvhg|iqdqfHd|p hqwrulqj|frp sdq|#

# 12-175MR ASIC freezes suspect funds held by unlicensed financial mentoring company

*Friday 27 July 2012*

ASIC has acted to secure funds invested with an online financial mentoring company, Investment Intelligence Corporation Pty Ltd (Investment Intelligence) while it investigates concerns that the company and its sole director, Mr Senen Pousa, are carrying on a financial services business without holding an Australian financial services (AFS) licence.

ASIC has also obtained a prohibition of departure order against Mr Pousa of Byron Bay in New South Wales.

On 26 July 2012, ASIC obtained interim orders, by consent, in the Queensland Supreme Court over $3,092,799 held by St George Bank and $313,136 held by American Express Australia in the accounts of Investment Intelligence.

The matter will return to the Queensland Supreme Court for further hearing at a later date.

## Background

Investment Intelligence sold financial mentoring memberships through an internet platform called ProphetMax. The membership involves a number of web-based modules that include general financial literacy, life coaching and foreign currency trading advice.

ASIC understands there are over 3,000 members worldwide, including Australia.

Investment Intelligence recommended that members engage in foreign currency trading through a broker called IB Capital registered, in New Zealand.

Members were then instructed by IB Capital to transfer their funds into an account with ING Bank in the Netherlands. It is believed that members were told that these funds would then be used for foreign currency trading by a company in the USA called Global Forex Management.

ASIC's investigation has revealed that Global Forex Management is not registered with the Commodities Futures and Trading Commission (CFTC) in the US to trade in foreign currencies.

Neither Investment Intelligence or Mr Senen Pousa hold an AFS licence under the *Corporations Act 2001*.

ASIC's investigation is continuing in conjunction with authorities in the US, New Zealand and the Netherlands.

ASIC Website: Printed 12/18/2012

# EXHIBIT C

**Investigation into international money laundering case**

17 december 2012 - Functioneel Parket

The Dutch Fiscal Intelligence and Investigation Service [FIOD] has arrested two main suspects in the Netherlands in a criminal investigation into laundering tens of millions of euros. The money originates from an international investment fraud, in which the two men, aged 33 and 40, allegedly play a role.

Through the intermediary of a company named IB Capital FX LLP, registered in New Zealand, many millions of euros from investors who thought they were investing in forex trade have been channeled away via Dutch bank accounts to bank accounts of the suspects in and outside the Netherlands. The deceived investors seem to live mainly in Australia and the United States, although some investors are from the Netherlands.

After a report from the Dutch Financial Markets Authority [AFM] who in turn had been informed by the supervisory bodies in Australia and the United States in September 2012, the FIOD intervened quickly. This approach has prevented more money from being channelled away and new investors from being defrauded.

The investigation is still ongoing and is conducted under supervision of the socalled Functioneel Parket of the Dutch Public Prosecution Service. At this time, neither the exact amount of the financial loss nor the exact number of victims has been established.

On Tuesday 11 September, the FIOD arrested a 33 year old Dutch citizen in the city of Haarlem. He had already been convicted for investment fraud before. At this time, the suspect is still in custody. On 17 December during the first public hearing, the District Court in Haarlem extended the pre-trial detention of the 33 year old man until the 11th of February 2013. That day there will be another public hearing.

On Saturday 3 November, the 40 year old suspect was arrested in the Dutch city of Winterswijk. This suspect had also been convicted before on account of fraud. Mid November, the Haarlem Court extended the pre-trial detention of this suspect until February 2013.

In the meantime, the FIOD and the Public Prosecution Service have seized bank accounts in the Netherlands and abroad containing over 13 million euro. Rounding up the investigation will at least take another few months.

*The Functioneel Parket is part of the Public Prosecution Service in the Netherlands and is specialised in the investigation and prosecuting of economic and environmental crimes. The Functioneel Parket staff has specific know-how which enables them to conduct complicated criminal financial investigations. On a regular basis they are involved in investigations with international dimensions.*

**EXHIBIT D**